UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :    Chapter 11

MARCUS LEE ASSOCIATES, L.P.                        :

            Debtor                                 :    Bankruptcy No. 09-11037bf
_____

MARCUS LEE ASSOCIATES, L.P.                        :

            Plaintiff                              :

            v.                                     :

                                                   :

WACHOVIA BANK, N.A.                                :
            Defendant                              :    Adversary No. 09-0143
_____

MERIDIAN OF VALLEY SQUARE                          :
CONDOMINIUM ASSOCIATION, INC.
            Plaintiff                              :

            v.                                     :

                                                   :

WACHOVIA BANK, N.A.                                :
            Defendant                              :    Adversary No. 09-0144
_____

...................................................

MEMORANDUM

...................................................

        Presently before me are motions filed by defendant Wachovia Bank, N.A.,

to dismiss the two adversary proceedings captioned above.  As will be discussed below,

both adversary proceedings seek to compel Wachovia to provide funds for the

construction of a "clubhouse" building that is part of a 200-unit condominium project

being developed by the debtor, Marcus Lee Associates, L.P.  One such proceeding is

brought by the chapter 11 debtor in possession.  The other proceeding is commenced by the Condominium Association asserting third party beneficiary status.

The debtor (hereinafter "Marcus Lee") sets forth five alternative causes of action to obtain the demanded funds: breach of contract, unjust enrichment, conversion, tortious interference, and breach of trust.  The Association, in its separate complaint, asserts similar alternative claims: breach of contract/third party beneficiary, constructive trust, specific performance, and breach of contract/diminution of value.

Wachovia, which has filed a secured claim asserting that Marcus Lee owes it more than $8 million, see Proof of Claim # 36, seeks dismissal under Fed. R. Bankr. P. 7012, arguing that neither complaint states a valid cause of action against it.  In light of the debtor's bankruptcy filing, Wachovia maintains that it has no obligation under law or equity to provide additional funding to Marcus Lee for construction of its clubhouse, or for any other purpose.  Wachovia further contends that the Association has no third-party beneficiary status and therefore no standing to assert claims against it.

To the extent any of these claims are considered non-core, all parties expressly consented to my rendering a final decision in these two proceedings.


I.


Federal Rule of Bankruptcy Procedure 7012 incorporates, inter alia, Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Recently, the Supreme Court explained the standard for determining whether a complaint states a cause of action, thus entitling the plaintiff to proceed to discovery and possibly to trial:

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [Bell Atlantic Corp. v. Twombly, 550 U.S. 544,  570, 127 S. Ct. 1955 (2007)].  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S. Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id., at 557, 127 S. Ct. 1955 (brackets omitted).

Two working principles underlie our decision in Twombly. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id., at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Id., at 556, 127 S. Ct. 1955.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007.] But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by

3

> factual allegations.  When there are well-pleaded factual
> allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to
> relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).

Therefore, I shall focus upon the allegations in the complaints filed by

Marcus Lee and the Association.  I shall accept those allegations as true, as well as all

reasonable inferences that may be drawn from those allegations.  If, nonetheless, either

complaint fails to meet the pleading standard set forth in Iqbal, dismissal is warranted,

see, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); In re Joubert, 411 F.3d 452

(3d Cir. 2005); Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988), unless leave to

amend is appropriate.  See, e.g., Jones v. Domalakes, 161 Fed. Appx. 216, 217 (3d Cir.

2006) (non-precedential); Chemtech Intern., Inc. v. Chemical Injection Technologies,

Inc., 170 Fed. Appx. 805, 811 (3d Cir. 2006) ("[I]n this circuit, '[w]hen a plaintiff does

not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the

court must inform the plaintiff that he has leave to amend within a set period of time,

unless amendment would be inequitable or futile.'") (quoting Grayson v. Mayview State

Hosp., 293 F.3d 103, 108 (3d Cir. 2002)); Griffin-El v. Beard, 2009 WL 1229599, at *6

(E.D. Pa. 2009).  Where, however, repleading could not correct the defects in a party's

claim, a court need not grant leave to amend.  See e.g., Alston v. Parker, 363 F.3d 229,

235 (3d Cir. 2004) ("We have held that even when a plaintiff does not seek leave to

amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a

curative amendment, unless an amendment would be inequitable or futile."); Peterson v.

Philadelphia Stock Exchange, 717 F. Supp. 332, 337 (E.D. Pa. 1989); see also Massarsky

4

v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983); Sarfaty v. Nowak, 369 F.2d

256, 259 (7th Cir. 1966) ("Rule 15(a) does not require a court to do a futile thing.").


II.


Marcus Lee is a limited partnership that was constructing at the time of its

bankruptcy filing an "age restricted" residential housing project called Meridian of Valley

Square, located in Warrington Township, Bucks County, Pennsylvania.  ML Complaint, ¶

7.  Marcus Lee intended that 200 residential units located in six high-rise buildings would

be built and sold as condominiums.  Id., at ¶ 9.  In addition to the six high-rise buildings,

Marcus Lee planned to build a recreation center for the condominium owners, referred to

as the "clubhouse" building.  Id., ¶ 9.

Wachovia agreed to provide Marcus Lee with construction financing.  The

first, or original, agreement was entered into on April 6, 2005; a copy of the agreement is

attached to the Marcus Lee complaint as exhibit A.  Id., at ¶ 6.  A second, or additional,

funding agreement was entered into on October 4, 2007.  Id., at ¶ 19.  A copy of this

additional agreement is attached to Wachovia's dismissal motion as exhibit B.[1]

---

[1]Although neither Marcus Lee nor the Association has attached a copy of this
funding agreement to their complaints, both complaints refer to it and rely upon its terms. As the
parties at oral argument did not dispute that Wachovia has attached a true and correct copy of the
2007 loan agreement to its motions to dismiss, this document can be considered for purposes of
the defendant's dismissal motions.  See Pryor v. NCAA, 288 F.3d 548, 560 (3d Cir. 2002).  In
Pryor, the Circuit Court explained:

> "[D]ocuments whose contents are alleged in the complaint and
> whose authenticity no party questions, but which are not physically
> attached to the pleading, may be considered. *** Documents that

(continued...)

In the original construction loan agreement, Wachovia agreed to lend "a sum aggregating not in excess of $44,483,020 but that at no time shall have an outstanding principle balance in excess of $17,500,000. . . ." ML Complaint, ex. A, at 2. Wachovia knew at the outset of the loan agreement that the proposed construction of the Meridian of Valley Square project included a clubhouse. Id., ¶ 12. Indeed, the clubhouse

---

[1](...continued)
the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such, they may be considered by the court."

(quoting 62 Fed. Proc., L. Ed. § 62:508); see also Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196-97 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1994):

> We previously left open whether a court may properly consider a concededly authentic document upon which the complaint is based when the defendant attaches such a document to its motion to dismiss. We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied. Our decision will not undermine the rationale underlying Rule 12(b)(6)'s requirement that a motion to dismiss be converted to a summary judgment motion if a court considers matters outside the pleadings. The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.

(citations omitted); accord In re Rockefeller Center Properties, Inc. Securitites Litigation, 184 F.3d 280, 287 (3d Cir. 1999); In re Beck, 272 B.R. 112, 114 n.1 (Bankr. E.D. Pa. 2002).

is part of the description of the Meridian of Valley Square project in both loan agreements.  Exs. A, B.

  A completed clubhouse was included in the marketing materials produced by Marcus Lee and presented to prospective condominium purchasers.  ML Complaint, ¶ 27; Association Complaint, ¶ 16.  Indeed, the Association avers that the "Clubhouse was a major selling point for potential purchasers,"  Association Complaint, ¶ 19, and Marcus Lee asserts that Wachovia was aware that condominium purchasers "relied upon the construction of a clubhouse."  ML Complaint, ¶ 12.

  As security for its loans to Marcus Lee, Wachovia received, <u>inter alia</u>, a mortgage and security agreement from the debtor as well as guarantees from two individuals.  Ex. A, at 2; ex. B, at 2.  As further protection for Wachovia, its loan advances to Marcus Lee were to take place in installments, with the installments related to the ability of Marcus Lee to construct condominium units and sell them as they were completed.  The 2005 loan agreement required Marcus Lee to pay to Wachovia a "release of lien price" of $100,000 for every condominium unit sold, "plus an amount equal to 100% of the portion of the Loan proceeds from the Hard Costs category of the Loan Budget advanced for such unit."  Ex. A, § 14, at 14.  The additional 2007 loan agreement contained simply a $50,000 per unit release of lien provision.  Ex. B, § 12, at 6.

  In other words, Wachovia held a lien on all of the Meridian of Valley Square real estate.  When a condominium unit was sold, a purchaser would insist on the release of Wachovia's lien upon that particular unit.  Upon payment of the contractual release price from Marcus Lee, Wachovia's lien would be removed.  As sales progressed, the amount of the real estate serving as collateral for Wachovia's loan would decrease.

The original 2005 loan agreement provided that the loan advances made by Wachovia would "be allocated in accordance with the budget set forth in Exhibit 'A' attached hereto" and incorporated into the agreement.  Ex. A, § 4.1, at 4.  However, Wachovia "may at its option reallocate the Loan, or any part thereof, among the categories set forth in Exhibit 'A' at any time and from time to time."  Id.

The loan budget attached to the 2005 loan agreement set forth the following loan allocation:

| | TOTAL COST | COST PER LOT | EQUITY | TOTAL LOAN | LOAN PER LOT |
|---|---|---|---|---|---|
| Land | $9,900,000 | $49,500 | $5,000,000 | $4,900,000 | $24,500 |
| Sitework: Escrow | 2,699,506 | 13,498 | --- | 2,699,506 | 13,798 |
| Sitework: Non-Escrow | 668,182 | 1,325 | --- | 265,000 | 1,325 |
| Financial Security Agreement | 171,632 | 2,874 | --- | 574,814 | 2,874 |
| Engineering Inspections | 269,950 | 1,350 | --- | 269,950 | 1,350 |
| Extension Pmts (for land acquisition) | 130,000 | 650 | 130,000 | --- | --- |
| **Total Acquisition & Development Costs** | **$13,839,270** | **$69,196** | **$5,130,000** | **$8,709,270** | **$43,546** |
| Legal/Appraisal/Title/Closing-land loan | $34,151 | $171 | **$34,151** | --- | --- |
| Loan Fee from land loan | 14,065 | 70 | 14,065 | --- | --- |
| Legal/Appraisal/Title/Closing | 75,000 | 375 | --- | 75,000 | 375 |
| Loan Fee | 208,000 | 1,040 | --- | 208,000 | 1,040 |
| Costs for furnishing two models | 150,000 | 750 | --- | 150,000 | 750 |
| Club House | 1,000,000 | 5,000 | --- | 1,000,000 | 5,000 |
| Architect & Engineering (refinance) | 320,750 | 1,604 | --- | 320,750 | 1,604 |
| Architect & Engineering | 500,000 | 2,500 | --- | 500,000 | 2,500 |
| Sewer & Water Fees | 1,120,000 | 5,600 | --- | 1,120,000 | 5,600 |
| Sales & Marketing | 600,000 | 3,000 | --- | 600,000 | 3,000 |
| Interest Reserve | 1,800,000 | 9,000 | --- | 1,800,000 | 9,000 |
| Hard Costs | 30,000,000 | 150,000 | --- | 30,000,000 | 150,000 |
| **Total Other Costs** | $35,821,966 | $179,110 | $48,216 | $35,773,750 | $178,869 |
| **TOTAL PROJECT** | **$49,661,236** | **$248,306** | **$5,178,216** | **$44,483,020** | **$222,415** |

Accordingly, the original 2005 loan agreement contemplated that Wachovia would periodically advance loans that would aggregate the total of $44,483,020, with $1,000,000 of those advances initially allocated to the construction of the clubhouse, but with reallocation among categories permitted at Wachovia's option. There was a $17,500,000 principal balance ceiling on the outstanding loan advances.

The original 2005 loan agreement further provided, in part:

> No advances from the "Hard Costs" category of the Loan Budget shall be made until [Plaintiff] obtains ten (10) "firm" agreements of sale for Units (as described in Section 4.7.2 of this Agreement), whereupon Borrower shall be permitted to request advances from the "Hard Cost" category of the Loan Budget up to the Maximum Hard Costs Advance for the construction of Building 1. No further advance from the "Hard Costs" or "Clubhouse" categories of the Loan Budget will be made until [Plaintiff] obtains twenty (20) "firm" agreements of sale for Units, whereupon [Plaintiff] shall be permitted to request advances (i) from the "Hard Costs" category of the Loan Budget up to the Maximum Hard Costs Advance for the construction of Building 2 and (ii) from the "Clubhouse" category of the Loan Budget for the construction of the Clubhouse. . . .

Ex. A, § 4.7.6. At the time of Marcus Lee's bankruptcy filing, it had sold 104 condominium units. ML Complaint, ¶ 18; Association Complaint, ¶ 23.

The 2007 loan agreement provided that of the additional $2,400,000 to be loaned by Wachovia, "an amount of the Loan equal to $600,000 shall be used by [Marcus Lee] solely for additional construction financing for the Clubhouse. . . ." Ex B, at 1. The remaining $1,800,000 was allocated to "working capital," id., and was advanced to Marcus Lee at the time of the 2007 loan agreement. Id., § 4.1, at 2. The $600,000 balance, identified as the "Clubhouse Allocation," could be requested by Marcus Lee "not

more frequently than twice monthly, as the work on the Clubhouse progresses. . . ."  Id., §
4.2, at 2.

The additional 2007 loan agreement also stated: "Borrower shall commence
and complete construction of the Clubhouse and shall comply in all respects thereto with
the provisions of Section 3 of the Original Loan Agreement."  Id., § 3, at 2.[2]  And it
provided that "prior to any advance by Lender of the $1,000,000 of loan proceeds that are
allocated to the construction of the Clubhouse pursuant to the Original Loan Agreement,
Lender shall have advanced the Clubhouse Allocation in full."  Ex. B, § 4.5.1, at 3.

Marcus Lee avers in its complaint that it received the full $600,000 advance
allocated to the construction of the Clubhouse by the additional 2007 loan agreement and
"repaid" that amount to Wachovia "pursuant to the terms of the Additional Funding
Agreement."  ML Complaint, ¶ 20.  The only provision of the 2007 loan agreement
discussing repayment is the $50,000 unit release payment.

Marcus Lee further alleges:

[A]t the time of the Petition only $114,880.00 was actually
drawn and outstanding regarding the funds for the
construction of the Clubhouse.

Per the Construction Loan Agreement, for each condominium
unit that was sold, $6,900.00, representing the $5,000.00 per
unit cost with a 1.38% accelerated payment, went directly to
Wachovia as an accelerated payback of the predetermined
earmarked loan amount for the Clubhouse.

Because of this agreement, from the one-hundred and four
(104) units sold by Plaintiff prior to the Petition date,
$717,600.00 has been paid to Wachovia.

---

[2]Section 3 of the 2005 loan agreement required Marcus Lee to construct the
Meridian of Valley Square buildings in accordance with the approved "plans and specifications"
and consistent with all statutes, laws and ordinances.

> Therefore, Wachovia has retained $602,720.00 of the funds that should be used to construct the Clubhouse.
>
> Plaintiff requested Wachovia release the $602,720.00 to fund the construction of the Clubhouse.
>
> Wachovia has refused to release the $602,720.00 required for completion of the clubhouse.

ML Complaint, ¶¶ 21-26.

> In contrast to Marcus Lee's allegations, the Association asserts:
>
> On or about October 4, 2007, the Debtor and Wachovia entered into a subsequent financing agreement (the "Additional Funding Agreement") for a total of $2,400,000.00 ($600,000.00 was earmarked to be used for construction of the Clubhouse).  A true and correct copy of the October 2, 2007 Term Sheet is attached to the Debtor's Adversary as Exhibit "B."
>
> Only $114,880.00 of the $600,000.00 was drawn down.
>
> However, pursuant to the Additional Funding Agreement, for each condominium unit that was sold, $6,900.00 went directly to Wachovia as an accelerated payback of the predetermined earmarked loan amount for the Clubhouse.
> ***
> Wachovia has retained at least $588,920.00 of the funds that should be used to construct the Clubhouse.
>
> Upon information and belief, the Debtor has repeatedly requested Wachovia release at least $588,920.00 to fund the construction of the Clubhouse.
>
> Upon information and belief, Wachovia has refused to release at least $588,920.00 required for construction of the Clubhouse.
>
> It is believed that the Debtor satisfied the requirements cited above so as to permit it to request the advance from the Clubhouse category of the Loan Budget and it is further believed that the Debtor made said request.

Upon information and belief, in violation of the terms of the Agreement, Wachovia only funded a portion of the building of the Clubhouse.

Pursuant to the closing procedure for each condominium sold at least $5,000.00 of the proceeds from the closing was to be held in escrow by Wachovia for the purpose of the construction of the Clubhouse.

Based on the foregoing it is believed that Wachovia holds at least $588,920.00 that is earmarked for the construction of the Clubhouse.

Association Complaint, ¶¶ 20-29.

Both the original 2005 loan agreement and the additional 2007 loan agreement included Marcus Lee's bankruptcy filing as an event of default of the loan agreements.  Ex. A, § 10.1, at 11; ex. B, § 8.1, at 5.  Upon an event of default, Wachovia may "refrain from making one or more disbursements of Loan proceeds which Borrower would otherwise be entitled to have made hereunder."  Ex. A, § 11.1.3, at 13.  Both loan agreements declare the parties' intention that there be no third-party beneficiaries of the loan agreements.  Ex. A, § 8, at 11; ex. B, § 7, at 4.  Both loan agreements contain integration clauses, which further state that modifications to the agreements must be in writing.  Ex. A, § 26, at 17; ex. B, § 26, at 9.  Both loan agreements are to be construed according to Pennsylvania law.  Ex. A, § 18, at 15; ex. B, § 18, at 7.  Finally, the additional 2007 loan agreement provided that "all property of the Borrower which may hereafter be deposited with or come into possession of Lender" constitutes collateral for Marcus Lee's indebtedness.  Ex. B, § 9.2, at 6.

III.

Before addressing Wachovia's motion to dismiss Marcus Lee's complaint, I

shall first consider the standing of the Association to raise its third party beneficiary

claims.  To the extent that the Association has not already conceded its lack of standing,[3] I

conclude that it holds no third-party beneficiary status regarding clubhouse funding from

Wachovia.

Pennsylvania common law regarding third party beneficiary status was

explained by its Supreme Court in <u>Scarpitti v. Weborg</u>, 530 Pa. 366 (1992):

> The current rule in Pennsylvania for designation of a party as
> a third party beneficiary was first articulated in the seminal
> case of <u>Spires v. Hanover Fire Insurance Co.</u>, 364 Pa. 52, 70
> A.2d 828 (1950) (plurality opinion).  In <u>Spires</u>, we held that in
> order for a third party beneficiary to have standing to recover
> on a contract, both contracting parties must have expressed an
> intention that the third party be a beneficiary, and that
> intention must have affirmatively appeared in the contract
> itself.  <u>Spires v. Hanover Fire Insurance Co.</u>, 364 Pa. at 57, 70
> A.2d at 830-31.  But, in <u>Guy v. Liederbach</u>, 501 Pa. 47, 459
> A.2d 744 (1983), we carved out an exception to the <u>Spires</u>
> rule, and allowed the beneficiary of a will to recover for legal
> malpractice against an attorney, despite the fact that the
> beneficiary was not in privity of contract with the attorney and
> was not named specifically as an intended beneficiary of the
> contract.  In so doing, we adopted the <u>Restatement (Second)</u>
> <u>of Contracts</u>, § 302 (1979), as a guide for analysis of third
> party beneficiary claims in Pennsylvania.  <u>Restatement</u>
> <u>(Second) of Contracts</u>, § 302 (1979) states:
>
> <u>Intended and Incidental Beneficiaries</u>
>
> (1) Unless otherwise agreed between promisor
> and promisee, a beneficiary of a promise is an
> intended beneficiary if recognition of a right to

---

[3]At oral argument, counsel for the Association acknowledged that its claims were
merely derivative of those raised by Marcus Lee.  Were Marcus Lee to prevail, then Marcus Lee
would obtain relief, not the Association; conversely, if Marcus Lee has no right to relief from
Wachovia, then neither would the Association.

performance in the beneficiary is appropriate to
effectuate the intentions of the parties and either

> (a) the performance of the promise will
> satisfy an obligation of the promisee to
> pay money to the beneficiary; or

> (b) the circumstances indicate that the
> promisee intends to give the beneficiary
> the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary
who is not an intended beneficiary.

Restatement (Second) of Contracts, § 302 (1979).

Consequently, this Court in <u>Guy</u> concluded:

> There is thus a two part test for determining
> whether one is an intended third party
> beneficiary: (1) the recognition of the
> beneficiary's right must be "appropriate to
> effectuate the intention of the parties," and (2)
> the performance must "satisfy an obligation of
> the promisee to pay money to the beneficiary"
> or "the circumstances indicate that the promisee
> intends to give the beneficiary the benefit of the
> promised performance."

Guy v. Liederbach, 501 Pa. at 60, 459 A.2d at 751.  The first
part of the test sets forth a standing requirement which leaves
discretion with the court to determine whether recognition of
third party beneficiary status would be appropriate.  The
second part defines the two types of claimants who may be
intended as third party beneficiaries.  If a party satisfies both
parts of the test, a claim may be asserted under the contract.

Id., 530 Pa. at 370-71.

After <u>Scarpitti</u>, a district court judge in this district summarized

Pennsylvania common law as follows:

> [A] party becomes a third party beneficiary only where both
> parties to the contract express an intention to benefit the third
> party in the contract itself, <u>Spires v. Hanover Fire Ins. Co.</u>,

14

> 364 Pa. 52, 70 A.2d 828 (1950), *unless*, [1] the circumstances
> are so compelling that recognition of the beneficiary's right is
> appropriate to effectuate the intention of the parties; *and* [2]
> the performance satisfies an obligation of the promisee to pay
> money to the beneficiary, or the circumstances indicate that
> the promisee intends to give the beneficiary the benefit of the
> promised performance.

Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394,

401 (E.D. Pa. 2002) (emphasis in original).

Although a contract need not expressly state an intention of parties to

benefit a non-contracting third party, this exception to the general rule does "not alter the

requirement that in order for one to achieve third party beneficiary status, that party must

show that both parties to the contract so intended, and that such intent was within the

parties' contemplation at the time the contract was formed."  Burks v. Federal Insurance

Co., 883 A.2d 1086, 1088 (Pa. Super. 2005).

In these adversary proceedings there is no dispute that both loan agreements

expressly provide: "The parties do not intend the benefit of this Agreement to inure to any

third party."  Therefore, the contracts do not express the intention of the contracting

parties to benefit any third parties, such as the Association or its members.  Moreover, the

Association's complaint does not aver facts which, taken as true, demonstrate

"circumstances . . . so compelling that recognition of the beneficiary's right is appropriate

to effectuate the intention of the parties [and that] . . . the performance satisfies an

obligation of the promisee to pay money to the beneficiary or [that] . . . the circumstances

indicate that the promisee intends to give the beneficiary the benefit of the promised

performance."  Two Rivers Terminal, L.P. v. Chevron USA, 96 F. Supp. 2d 432, 450

(M.D. Pa. 2000).

15

In <u>Scarpitti v. Weborg</u>, 530 Pa. 366 (1992), homeowners, who were subject to a deed restriction requiring architectural approval, by a specified architectural firm, of building plans, sued the architect when he approved improvements on other owners' lots that he had previously disapproved on their lots.  The architect argued that no privity of contract existed between him and the homeowners.  The court in <u>Scarpitti</u> concluded that the homeowners were intended third party beneficiaries of an implied contract between themselves and the architect.  The court noted that "the purpose of this agreement was to make the lots more attractive to prospective purchasers by assuring that other homeowners in the subdivision would be required to abide by the recorded subdivision restrictions." <u>Id.</u>, at 373.

The Association argues that Wachovia knew that the clubhouse was intended for use by the condominium owners and that its existence would add value to the development and thus also to the individual units.  However, in contrast to the architect in <u>Scarpitti</u>, Wachovia was not contractually obligated to perform any service directly to the Association or its members.  Rather, Wachovia's role in the development was solely as lender to Marcus Lee, and it took pains in its loan agreements to insure that it had no obligation to non-borrowers.  Thus, I find that the reasoning employed in <u>Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.</u>, 521 N.Y.S.2d 165 (App. Div. 3d 1987), is more applicable to these alleged facts than those of <u>Scarpitti</u>.

In <u>Lake Placid</u>, owners of condominium units sued the builder and architects of their condominium units, alleging breach of contracts between the project developer and the builder, and between the developer and the architects.  <u>Id.</u>, at 166.  "As to plaintiff''s breach of contract claims, it is conceded that, since there was no contractual

16

relationship between plaintiff's members and defendants, recovery is dependent upon a

showing that plaintiff's members were third-party beneficiaries of the developer's

contracts with defendants." Id., at 166.

The state court, applying the Restatements (Second) of Contracts § 302 as

Scarpitti did, found no facts from the contractual language or other circumstances

manifesting a mutual intent of the contracting parties to confer rights to performance on

the unit owners. Id., at 166. "Indeed, there is nothing whatsoever in the record to suggest

that the developer had in mind anything but the normal business motive to obtain a

construction product of sufficient quality for ready marketability of the condominium

units to potential customers. Such a motive is clearly not a basis from which to infer the

requisite intent of the developer to bestow performance benefits upon the purchasers of

the condominium units, let alone their successors . . . and explains why, ordinarily,

construction contracts are not construed as conferring third-party beneficiary enforcement

rights. . . ." Id., at 166-67. See also Association of Apartment Owners of Newtown

Meadows v. Venture 15, Inc., 115 Hawai'i 232 (2007) (discussing several construction

cases denying third party beneficiary status to the ultimate users of the building

constructed).

Here, though the Association and Marcus Lee believe the clubhouse to be

an integral part of the development, the Association has alleged no facts supporting that

Wachovia intended to benefit the residents of the development through its loan

agreements with Marcus Lee, rather than simply benefitting itself from fees and interest

earned on its loan. See also Hibbs v. K-Mart Corp., 870 F.2d 435 (8th Cir. 1989) ("The

economic consequences to the third party in the event that the agreement between the

contracting parties is breached 'do not necessarily relate to the controlling question of whether the parties who entered the contract intended and expressed an intention to benefit those claiming to be third-party beneficiaries.'"), quoting Bailey v. Iowa Beef Processors, Inc., 213 N.W.2d 642, 646 (Iowa 1973); Terrace Creek Assoc. v. Woolpert Engineering Co., 2002 WL 1832917 (Ohio App. 2 Dist. Aug. 9, 2002) ("[T]here is no evidence in the record to indicate that Woolpert intended more than an incidental benefit to Terrace Creek.  On the contrary, the evidence shows that the contract was intended to benefit Smith, who was developing this tract of land and needed retention ponds to do so. While the ponds may have provided an incidental benefit to Terrace Creek, this is not sufficient to support a claim for third-party beneficiary breach of contract.").

Accordingly, I find that the Association (and its members) is at best an incidental, not an intended, beneficiary of the agreements between Marcus Lee and Wachovia, and therefore has no standing to bring claims against Wachovia based upon the loan agreements or Wachovia's failure to provide funds for the further construction of the clubhouse.

Thus, Wachovia's motion to dismiss the Association's complaint will be granted.  This leaves Marcus Lee's complaint for consideration.[4]

IV.

---

[4]To the extent that the Association raises claims against Wachovia that would not be dependent upon third party beneficiary status, it does not support such claims in its memorandum in opposition to dismissal.  Instead, it merely incorporates Marcus Lee's memorandum in opposition.  Association Memorandum, at 2 n.1.  For reasons discussed below, Marcus Lee's present complaint does not state any cause of action against Wachovia.

In Count I of its complaint, Marcus Lee contends that Wachovia has breached its contract with the debtor, that contract being the original 2005 loan agreement and "various amendments thereto." ML Complaint, ¶ 33. Marcus Lee maintains that, of the release payments made to Wachovia prepetition, $717,600 should be classified as repayment of loan funds allocated to the clubhouse construction. Id., ¶ 38. It further asserts that it has an "outstanding balance of $114,800.00 regarding the funds for the Clubhouse" owed to Wachovia. Id., ¶ 36. It claims that Wachovia is contractually obligated to advance $602,720 ($717,600 minus $114,880) for further clubhouse construction.

In considering the sufficiency of Marcus Lee's contract claim, I note that Wachovia argues that this plaintiff cannot assert any rights under the loan agreements because Marcus Lee's chapter 11 filing triggered a default, thereby permitting Wachovia to decline to lend further funds. The defendant's contention is supported by 11 U.S.C. § 365, as construed by the Third Circuit Court of Appeals.

In In re Watts, 876 F.2d 1090 (3d Cir. 1989), debtors sought to compel the Pennsylvania Housing Finance Co. (PHFA) to provide mortgage payments to their mortgagees through the Commonwealth's Homeowner's Emergency Mortgage Assistance Program, for which the debtors had qualified prepetition. The Circuit Court considered such a prepetition obligation by the PHFA to be classified as an executory contract within the meaning of section 365, as performance was "due on both sides . . . ; PHFA was to have advanced payments . . . and plaintiffs were obligated to repay PHFA." Id., 876 F.2d at 1095-96 & n. 9. Although the Bankruptcy Code generally prohibits a non-debtor party from declaring the debtor in default of a prepetition executory contract

19

solely because of the debtor's bankruptcy filing, the Third Circuit instructed that PHFA's

executory contract fell within an express statutory exception to this principle:

> Section 365(c)(2) of the Code precludes the assumption or
> assignment of an executory "contract to make a loan, or
> extend other debt financing or financial accommodations, to
> or for the benefit of the debtor."  Relatedly, section
> 365(e)(2)(B) provides that such contracts are excepted from
> the general rule prohibiting the termination of contracts
> because of a bankruptcy filing.  As one commentator has
> summarized, "[t]he Code provides explicitly that there is no
> way that a debtor can assume [a financing] agreement and
> thus compel its lender to continue to advance funds during
> reorganization."  Levit, <u>Use and Disposition of Property
> Under Chapter 11 of the Bankruptcy Code: Some Practical
> Concerns</u>, 53 Am. Bankr. L.J. 275, 276 (1979). . . .  PHFA's
> commitments to plaintiffs are executory contracts to "make a
> loan or extend other debt financing" and thus are terminable
> by PHFA under section 365(e)(2)(B).

<u>Id.</u>, 876 F.2d at 1095-96; <u>see also</u> <u>In re Thomas B. Hamilton Co., Inc.</u>, 969 F.2d 1013,

1018 (11th Cir. 1992).

In other words, section 365(c) and (e) prevents a trustee or chapter 11

debtor in possession from assuming a prepetition lending agreement under section 365(a)

and permits the lender to decline to advance postpetition funds, even if the lender had a

pre-bankruptcy contractual obligation to do so.

> Section 365(c)(2) is designed "to protect a party to a contract
> from being forced to extend cash or a line of credit to one
> who is a debtor under the Bankruptcy Code."  1 <u>Collier
> Bankruptcy Manual</u>, ¶ 365.02[2], at 14-15 (3d ed. 1995).
> Thus, the trustee "may not force a creditor into the untenable
> position of having to extend straight cash to an insolvent
> debtor."  <u>Id.</u> at 15.  <u>See also</u> H.R. Rep. No. 595, 95th Cong.,
> 2d Sess. 348, reprinted in 1978 U.S.C.C.A.N. 5963, 6304
> ("The purpose of [section 365(c) ], at least in part, is to
> prevent the trustee from requiring new advances of money or
> other property.  The section permits the trustee to continue to
> use and pay for property already advanced, but is not designed
> to permit the trusee [sic] to demand new loans or additional

20

transfers of property under lease commitments."); 2 <u>Norton
Bankruptcy Law and Practice 2d</u> § 39:19, at 58-59 (1994)
(section 365(c)(2) "fully protects the third party lender
suddenly faced with a credit agreement involving a debtor in
bankruptcy, where the initial agreement was based at least in
part on the financial strength of the debtor.").

<u>In re Cannonsburg Environmental Associates, Ltd.</u>, 72 F.3d 1260, 1266 (6th Cir. 1996);

<u>see</u>, <u>e.g.</u>, <u>In re United Airlines, Inc.</u>, 368 F.3d 720, 723 (7th Cir. 2004) ("Section

365(c)(2) prevents the assumption of a loan commitment or equivalent promise because

the cost of future credit depends on the probability of repayment, and bankruptcy reveals

that the risk of nonpayment is higher than the would-be creditor likely assumed.").

Postpetition loans are governed by section 364 of the Code and involve only voluntary

actions by lenders.  <u>See</u> <u>In re Sun Runner Marine, Inc.</u>, 945 F.2d 1089 (9th Cir. 1991).

Accordingly, Marcus Lee's contention that the two loan agreements,

particularly § 4.7.6 with its 20-unit sale trigger, "required [Wachovia] to fund

construction of the Clubhouse regardless of the status of any of the remaining loan

'categories' in the Agreements,"  ML Memorandum, at 6, and Wachovia's assertion that

the debtor's default under the loan agreements "alleviated Wachovia of any contractual

duty to provide additional advances and/or other funds," Wachovia Memorandum, at 7,

need not be considered.  To the extent that Marcus Lee claims that it had a prepetition

contractual right to receive loan advances from Wachovia for construction of its

clubhouse, section 365(c) and (e) renders any such contractual right unenforceable as a

matter of law, and thus no cause of action for breach of contract can be stated.


V.

Similarly, the failure of Wachovia to honor a prepetition commitment to lend money to Marcus Lee, which commitment is unenforceable under section 365, does not give rise to a claim for unjust enrichment (Count II), conversion (Count III), tortious interference (Count IV) or breach of trust (Count V).

Unjust enrichment is an equitable doctrine under Pennsylvania law. See Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. 1993). Pennsylvania law requires that a plaintiff prove: (1) "benefits conferred on defendant by plaintiff," (2) "appreciation of such benefits by defendant," and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Id. (citing Wolf v. Wolf, 356 Pa. Super. 365 (1986), overruled on other grounds, Van Buskirk v. Van Buskirk, 527 Pa. 218 (1991)). The primary focus is whether the defendant has unfairly benefitted at the plaintiff's expense. Id.

Not only would federal law, i.e., section 365, support Wachovia's refusal to lend money to a chapter 11 debtor, thus rendering such conduct equitable, and not only is Wachovia claiming to be owed more than $8 million, thus justifying its refusal to lend further funds, but:

> A cause of action for unjust enrichment may arise only when a transaction of the parties not otherwise governed by an express contract confers a benefit on the defendant to the plaintiff's detriment without any corresponding exchange of value. . . . In that event, the law may imply a contract, requiring the defendant to pay to the plaintiff the value of the benefit conferred. . . . Such a "quasi-contract" imposes a duty "not as the result of any agreement, whether express or implied, but in spite of the absence of an agreement" where the circumstances demonstrate that it would be inequitable for the defendant to retain the benefit conferred without payment. Temple Univ. Hosp., 832 A.2d at 507 (quoting AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988 (Pa. Super. 2001)). Where an express contract already exists to define the

22

> parameters of the parties' respective duties, the parties may
> avail themselves of contract remedies and an equitable
> remedy for unjust enrichment cannot be deemed to exist. . . .

Villoresi v. Femminella, 856 A.2d 78, 84 (Pa. Super. 2004), appeal denied, 582 Pa. 719

(2005); see also Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999); In re

Premium Motor Cars, Inc., 404 B.R. 128, 135 (Bankr. W.D. Pa. 2009).

Here, the rights and responsibilities of both parties were governed by an

express contract.

As for Marcus Lee's third alternative claim, the tort of conversion in

Pennsylvania, is defined as:

> "the deprivation of another's right of property in, or use or
> possession of, a chattel, or other interference therewith,
> without the owner's consent and without lawful justification."

Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 451 (1964) (quoting  Gottesfeld

v. Mechanics & Traders Ins. Co., 196 Pa. Super. 109, 115 (1961)); see McKeeman v.

Corestates Bank, N.A., 751 A.2d 655, 659 n.3 (Pa. Super. 2000).  Section 365 provides

Wachovia with lawful justification for its refusal to advance funds to Marcus Lee.

The same result occurs with respect to Marcus Lee's fourth claim:

> Under Pennsylvania law, to prevail on a claim for tortious
> interference with existing or prospective contractual
> relationships, a party must prove: (1) the existence of a
> contractual or prospective contractual or economic
> relationship between the plaintiff and a third party; (2)
> purposeful action by the defendant, specifically intended to
> harm an existing relationship or intended to prevent a
> prospective relation from occurring; (3) the absence of
> privilege or justification on the part of the defendant; (4) legal
> damage to the plaintiff as a result of the defendant's conduct;
> and (5) for prospective contracts, a reasonable likelihood that
> the relationship would have occurred but for the defendant's
> interference.

Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 212 (3d Cir. 2009); see

Phillips v. Selig, 959 A.2d 420, 429 (Pa. Super. 2008).  Again, the provisions of section

365 provides Wachovia with justification for its refusal to advance funds.

   Finally, Marcus Lee's contention in its fifth claim that Wachovia was acting

as a fiduciary, ML Complaint, ¶ 74, suffers not only because of the provisions of section

365, but based upon state law.

   Absent a contractual provision establishing a fiduciary relationship, such as

a trust agreement, which provision does not exist in either the 2005 or the 2007 loan

agreement, Pennsylvania common law will impose a fiduciary duty where "one person

has reposed a special confidence in another to the extent that the parties do not deal with

each other on equal terms, either because of an overmastering dominance on one side or

weakness, dependence or justifiable trust, on the other."  In re Johnson, 292 B.R. 821,

828 (Bankr. E.D. Pa. 2003) (citing Destefano & Associates, Inc. v. Cohen, 2002 WL

1472340, at *3 (Pa.  Ct. Com. Pl.  May 23, 2002), quoting Commonwealth Dept. of

Transp. v. E-Z Parks, Inc., 153 Pa. Commw. 258, 268, 620 A.2d 712, 717 (1993)); see

also Lichtman v. Taufer, 2004 WL 1632574, at *7 (Pa. Com. Pl. Jul. 13, 2004) (same).

This does not arise in the context of a commercial loan agreement between Wachovia and

Marcus Lee.  See I & S Associates Trust v. LaSalle National Bank, 2001 WL 1143319,

at *7 (E.D. Pa. Sept. 27, 2001) ("Under Pennsylvania law, the lender-borrower

relationship does not ordinarily create a fiduciary duty."); Gonzalez v. Old Kent Mortg.

Co., 2000 WL 1469313, at *6 (E.D. Pa. Sept. 21, 2000); Federal Land Bank of Baltimore

v. Fetner, 269 Pa. Super. 455 (1979).

24

Accordingly, without consideration of Wachovia's numerous

arguments—e.g., Marcus Lee's tort claims are barred by Pennsylvania's "gist of the

action" doctrine, which "precludes plaintiffs from recasting ordinary breach of contract

claims into tort claims," Erie Ins. Exchange v. Abbott Furnace Co. 972 A.2d 1232, 1238

(Pa. Super. 2009); see also Bishop v. GNC Franchising LLC,  248 Fed. Appx. 298,

299-300 (3d Cir. 2007) (non-precedential)—the plaintiff does not state any claim arising

from Wachovia's refusal to loan funds postpetition for construction of the clubhouse.


VII.


This conclusion, however, does not completely resolve defendant's motion

to dismiss.  Although the complaint is less than clear, Marcus Lee may be asserting

claims that do not implicate section 365.

In its complaint, Marcus Lee alleges that it sold 104 condominium units

prepetition and paid Wachovia $6,900 per unit toward construction of the clubhouse for a

total of $717,600.  ML Complaint, ¶¶ 18, 22.  It further asserts that it has borrowed only

$114,880 for clubhouse construction.  Id., ¶ 21.  Marcus Lee then maintains that the

difference between the sums it paid to Wachovia and the amount loaned by Wachovia are

"excess clubhouse payments" that are property of Marcus Lee:

> Plaintiff's breach of contract claim is not a request for
> Wachovia to make an additional loan to Plaintiff.  To the
> contrary, Plaintiff's breach of contract claim seeks the return
> of prepayments made (i.e., the Excess Clubhouse Payments)
> on account of a loan to be made in the future.  Because
> Wachovia will not make the future loan, Wachovia cannot
> retain the prepayments.  The Excess Clubhouse Payments are
> the property of Plaintiff.  Plaintiff's breach of contract claim

25

seeks a refund of the Excess Clubhouse Payments, not an
additional loan.

ML Memorandum, at 9.

In support thereof, Marcus Lee alleged in paragraphs 71-72 of its

complaint:

As described, $6,900.00 of each condominium unit sold went
back to Wachovia as an accelerated or preemptive payback of
the funding for construction of the Clubhouse.

Wachovia expressly agreed that this money [$6,900] was to
be held by Wachovia and earmarked for the purpose of
funding the construction of the Clubhouse.

Wachovia responds, persuasively, that neither the original 2005 loan

agreement nor the additional 2007 loan agreement contains any provisions supporting

Marcus Lee's assertion that the parties agreed to establish a clubhouse funding

mechanism, whereby a portion of the release payments made by Marcus Lee would be

segregated as the debtor's property or as excess clubhouse payments.  No provision of

these loan agreements refer to escrows, earmarking or segregated accounts concerning

construction of the clubhouse.[5]

_____For example, Section 4.7.6 of the original 2005 loan agreement, emphasized

by Marcus Lee, only establishes conditions that must be satisfied before Marcus Lee

---

[5]Indeed, the original loan agreement, in § 4.6, does provide for Marcus Lee to
make voluntary deposits into a "restricted interest bearing account with the Lender." Ex. A.
This account, however, was intended solely to protect Wachovia if, after Marcus Lee repaid its
loan obligation in full, Wachovia was not released by third parties from its "Completion
Assurance Agreements."  Upon Marcus Lee's funding such a restricted account in an amount
equal to Wachovia's maximum potential liability under such assurance agreements, Wachovia
would cancel Marcus Lee's promissory note and satisfy its mortgage.  Id.
        The absence of any similar provision regarding clubhouse construction speaks to
the parties' lack of intent to set up any special accounts, at least through the October 2007
additional loan agreement.

could request loan advances for the clubhouse construction.  This contract provision

neither states nor suggests that the advances made thereunder would be from an escrow of

Marcus Lee's own money, rather than loans made by Wachovia.  Similarly, the loan

budget incorporated into the 2005 loan agreement merely sets forth the estimated amounts

needed for various categories of construction costs to be funded by loans made by

Wachovia.  And the contract provisions requiring release payments do not support

Marcus Lee's escrow, earmarking or segregated account argument.  Such payments were

intended simply as a reduction of the borrower's secured indebtedness.  See generally In

re Comer, 18 B.R. 969 (Bankr. M.D. Pa. 1982).

"Pennsylvania law provides that when parties to a contract have reduced

their agreement to writing, that writing will be the sole evidence of their agreement, and

parol evidence may not be admitted to vary the terms of the contract in the absence of

fraud, accident or mistake."  Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989,

994 (3d Cir. 1987); see also Yocca v. Pittsburgh Steelers Sports, Inc., 578 Pa. 479 (2004).

Parol evidence consists of an oral or written statement made before or at the same time as

the written agreement that purportedly attempts to alter the terms of the written

agreement.  See, e.g., United States Gypsum Co. v. Schiavo Brothers, Inc., 450 F. Supp.

1291, 1302 (E.D. Pa. 1978), aff'd in part, 668 F.2d 172 (3d Cir. 1981).

The parol evidence rule applies only if the parties intended the written

contract to represent their entire agreement.  See Hershey Foods Corp. v. Ralph Chapek,

Inc., 828 F.2d at 994; Henry v. First Federal Savings & Loan Association of Greene

County, 313 Pa. Super. 128, 136 (1983).  Where the parties so intend, the written

agreement is said to be integrated.  Frequently, as in this proceeding, the written contract

27

will contain an integration clause, which "expressly states that [the writing] contains the

entire agreement of the parties." <u>United States Gypsum Co. v. Schiavo Brothers, Inc.</u>,

450 F. Supp. at 1302.  Where there is an integration clause, a court will presume that the

written contract contains the entire agreement between the parties "absent a showing that

[the] integration clause was procured through fraud, accident, or mistake." <u>Id.</u> at 1302;

<u>see</u> <u>also</u> <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 578 Pa. at 498.

Thus, to the extent that Marcus Lee relies upon the two loan agreements for

its breach of contract claim, and to the extent its other claims are governed by those two

agreements, and those two agreements contain terms that contradict the debtor's

assertions in its complaint, dismissal of Marcus Lee's claims under Rule 12(b)(6) is

warranted.  <u>See</u> <u>Rose v. Rothrock</u>, 2009 WL 1175614, at *6 (E.D. Pa. 2009):

> While the Court must accept as true all allegations in a
> Complaint, it is not obliged to ignore exhibits that directly
> contradict those allegations, especially inasmuch as a Plaintiff
> himself has authored and offered the exhibit. <u>See</u>, <u>e.g.</u>, <u>WP
> 851 Assoc., L.P. v. Wachovia Bank, N.A.</u>, Civil Action No.
> 07-2374, 2008 WL 114992, at *8-9 (E.D. Pa. Jan.10, 2008)
> (dismissing a claim when an exhibit attached to the complaint
> contradicted the allegations in the complaint); <u>Centrella v.
> Barth</u>, 633 F. Supp. 1016, 1019 (E.D. Pa.1986) ("We accept
> as true the allegations of the complaint insofar as they are
> specific, factual and not contradicted by plaintiff's exhibits.").
> Because the Complaint, including exhibits, does not
> sufficiently allege the existence of a contract, Mr. Rose's
> claim for breach of contract must be dismissed.

Nonetheless, while the original 2005 loan agreement stated that its written

terms constituted the entire agreement of the parties, they subsequently entered into a

modification of that agreement in 2007.  And while the 2007 loan agreement was also

intended by the parties to contain their entire understanding, this latter document also

provided that it might be amended or modified in writing.  Ex. B., § 26, at 9.

28

Despite language stating that subsequent modifications or amendments must be in writing, Pennsylvania law enforces an oral modification or amendment in certain circumstances:

> "[A] written contract may be orally modified, even when the contract expressly provides that modifications must be in writing. [. . .] <u>Somerset Community Hospital v. Mitchell</u>, 454 Pa. Super. 188, 685 A.2d 141 (1996). As <u>Somerset</u> indicates, 'an agreement that prohibits non-written modification may be modified by [a] subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing.' Finally, an oral modification of a written contract must be proved by clear, precise and convincing evidence."

<u>ADP, Inc. v. Morrow Motors Inc.</u>, 969 A.2d 1244, 1249 (Pa. Super. 2009) (quoting <u>Fina v. Fina</u>, 737 A.2d 760, 764 (Pa. Super. 1999)).

Therefore, if Wachovia and Marcus Lee subsequently modified their October 19, 2007 loan agreement, even orally, so as to establish an escrow account or restricted account to be used by Marcus Lee to fund construction of its clubhouse building with funds derived from release payments, then such an agreement may create a property interest in those funds in favor of Marcus Lee, <u>see</u> <u>generally</u> <u>In re Rosenshein</u>, 136 B.R. 368 (Bankr. S.D.N.Y. 1992), and be enforceable, either as a claim of conversion, breach of fiduciary duty or possibly contract. <u>See</u> <u>generally</u> <u>In re GOE Lima, LLC</u>, 2009 WL 2901521 (Bankr. N.D. Ohio 2009). The obligation of Wachovia to hold funds either in escrow or in a segregated or restricted account may preclude any setoff rights, both common law and contractual. <u>See</u> <u>Royal Bank of Pennsylvania v. Selig</u>, 434 Pa. Super. 537, 545 (1994) (bank setoff requires that funds be deposited into a general rather than special purpose account). And section 365 would not prevent Marcus Lee from recovering its own property being held by Wachovia.

29

I appreciate that Wachovia implies in its reply memorandum that there was no modification of the 2007 loan agreement, and no escrow or restricted account that it was obligated to establish in connection with the clubhouse construction.  Nonetheless, if Marcus Lee can in good faith amend its complaint to assert the existence of such a post-October 2007 accord, with allegations sufficiently detailed to meet the <u>Iqbal</u> standard, it is entitled to do so.

An appropriate order shall be entered.